STRICKLAND *v.* THE STATE.

No. 6836.   DECEMBER 11, 1928.

*G. F. Kelley, W. J. Phillips,* and *B. P. Gaillard Jr.,* for plaintiff in error.

*George M. Napier, attorney-general, Robert McMillan, solicitor-*

*general, T. R. Gress, assistant attorney-general,* and *E. D. Kenyon,* contra.

HINES, J. The defendant was indicted for murder and was convicted, with a recommendation. He moved for a new trial upon the formal grounds, and by amendment added certain special grounds, which will sufficiently appear in this opinion.

■ The defendant insists that the court erred in failing to give in charge to the jury the definition of circumstantial evidence embraced in the Penal Code, § 1009, and in failing, in connection therewith, to give in charge to the jury the weight to be given to circumstantial evidence as defined in § 1010. On the trial of a criminal case, where a conviction depends solely upon circumstantial evidence, it is the duty of the judge, whether so requested or not, to give in charge to the jury the principles of law by which the weight of the circumstances is to be determined, and under what circumstances a conviction on circumstantial evidence is warranted. *Hamilton* v. *State,* 96 *Ga.* 301 (22 S. E. 528) ; *Jones* v. *State,* 105 *Ga.* 649 (31 S. E. 574) ; *Smith* v. *State,* 125 *Ga.* 296 (54 S. E. 127) ; *Weaver* v. *State,* 135 *Ga.* 317, 320 (69 S. E. 488). Where there is both direct and circumstantial evidence of guilt, the failure of the trial judge to charge on circumstantial evidence is not reversible error, in the absence of a timely written request. *Smith* v. *State,* supra; *Brannon* v. *State,* 140 *Ga.* 788 (80 S. E. 7) ; *Mitchell* v. *State,* 151 *Ga.* 450 (2) (107 S. E. 43) ; *Collier* v. *State,* 154 *Ga.* 68 (113 S. E. 213). So the question arises, does the conviction of the defendant rest entirely upon circumstantial evidence ? One view of the evidence makes substantially this case :

The defendant and one Reed were deputy sheriffs. They had a warrant for the arrest of the deceased to answer a misdemeanor charge. These officers went to the home of one Pirkle for the purpose of arresting the deceased. They found him there. One of these officers called to him. The deceased said, "What do you want ?" The defendant told him that he had a warrant for him. The deceased then wanted to know what it was about, and the defendant said that it was something about whisky. The deceased told the defendant that he wanted to see the warrant. Reed had the warrant in his pocket and handed it to the defendant. The defendant told the deceased to get into his automobile and go to town. The deceased said, "No, wait until Monday." The de-

fendant told the deceased again to get in and go to town and fix it up. The defendant then got out of his automobile to arrest the deceased. The deceased ran. The defendant told Reed to go around the house and head him off. Reed went around the house for that purpose. The defendant then got into his automobile and went in another direction to arrest the deceased. When Reed returned he did not see the defendant, but saw the automobile standing down the road in a deep cut. Reed went down there to see what happened. He saw where somebody had crawled up the bank. He stepped out into the edge of the woods. About that time he heard a shot. Saw a little smoke on the rise of the hill close to some rocks. He heard only one shot. After he saw the smoke he went to a briar-patch and stopped there. Saw the defendant coming back down through the woods from the direction in which he heard the shot. The defendant had a 44-caliber Smith & Wesson pistol in his hand. When he got back close to Reed he put it in its scabbard. He asked Reed why he did not catch the deceased. Reed replied that he was not going to catch the deceased or anybody else with his broken arm. The defendant then said that he "tried to cut the damn scaper's legs off," and that the last he saw of the deceased "he was going like a bat out of Californey." The deceased was found in the direction from which this shot was heard. He was found to be shot in the back, the ball passing through his body and out in front. The physician, who attended the deceased at the hospital, testified that in his opinion the wound was a bullet wound, and that he would say it was made with a 38 or 44 bullet.

Under these facts, was the evidence against the defendant solely circumstantial? Confessions of guilt may, according to their nature, be direct or circumstantial evidence. If they be of facts directly admitting the commission of the crime charged, they are direct evidence; but if the fact confessed be only matter from which an inference of participation arises, they are circumstantial only. An admission of participation in a shooting, which results in the death of another, is to be taken as direct, and not mere circumstantial evidence of guilt. *Eberhart* v. *State,* 47 *Ga.* 598 (8); *Perry* v. *State,* 110 *Ga.* 234 (3), 238 (36 S. E. 781); *Wilburn* v. *State,* 141 *Ga.* 510 (9), 513 (81 S. E. 444); *Greer* v. *State,* 159 *Ga.* 85 (6), 94 (125 S. E. 52). Where the State introduced the

dying declaration of the deceased, in which he stated that either the defendant or another officer, both of whom were pursuing and attempting to arrest him, shot him, and proved that the defendant, returning from the place where shots were heard, and having in his hand his pistol, stated that he had tried to cut off the legs of the deceased, who was trying to escape, and that he guessed he hit him, the deceased being found shortly afterwards shot in the back, the bullet passing through and out of his body, a conviction of the defendant does not depend entirely upon circumstantial evidence; and it was not erroneous for the court to omit an instruction on the law of circumstantial evidence, in the absence of a proper request. *Toliver* v. *State,* 138 *Ga.* 138 (74 S. E. 1000) ; *McElroy* v. *State,* 125 *Ga.* 37 (53 S. E. 759).

■ The defendant insists that the court erred in failing to give in charge to the jury the law of alibi as defined in the Penal Code, § 1018. We do not think that the defense of alibi was involved under the facts appearing in the record; and the court did not err in not giving in charge the law relating to that defense.

■ The State offered in evidence a writing signed by the deceased, and containing his dying declarations, as follows: "I was out near Mr. Ben Pirkle's house this afternoon when Homer Strickland and another officer came up and said they had a warrant for me. We three sat down there and I looked at the warrant and saw that it was a warrant for having whisky, and I told them to wait until Monday and I would come in town and make bond. I told them my wife and child had nothing for supper, and I would like for the warrant to wait until Monday. Then the officers said 'No,' and talked to me pretty rough, and I just run off and the officers took after me. We ran down through the woods, and I was running up a little hill when they shot me in the back. I know one of those two officers shot me, but I don't know which one. The two officers were the only folks anywhere around there, and they were just about twenty steps behind me and running after me when I was shot. After I was shot the two officers came up in about fifteen steps of me, and I called to them and told them I was shot and dying, and asked them to come take me to town. But neither of them said a word. They just looked at me and went on off. Then I crawled as far as I could and holloed for

help, and after a long time some fellows come by and found me and brought me to town. I am suffering awful now, and I feel like I am going to die pretty soon. After they shot me and came up close to me I told them to help me. I saw one of them throw something down, and when they went off and left me I crawled up there to where they had stood and found an empty cartridge and put it in my pocket. I am weakening now, and I can't stand this suffering much longer." The defendant objected to the admission of this evidence, upon the grounds that (a) the written dying declaration of the deceased shows on its face that he did not know who killed him; (b) said declaration is incompetent and inadmissible; (c) a part of said statement is irrelevant and has no place in a dying declaration; (d) said dying declaration would not be admissible unless the other officer was indicted and on trial in the case; and (e) the deceased in his statement said that one of the officers shot him, showing that he did not know the person who shot him. The court overruled these objections and admitted the dying declaration. To this ruling the defendant excepts.

In their brief counsel for the defendant insist only upon the objection that this dying declaration as a whole was inadmissible because the deceased did not know who killed him. We do not think this objection is well taken. The deceased expressly stated that he knew that one of the officers, who were pursing and attempting to arrest him, shot him, but that he did not know which one shot him. It is true that dying declarations are admissible only to show the cause of the death of the declarant and the person who killed him. Penal Code (1910), § 1026. Where it was manifestly impossible that the deceased could have seen his assailant or known certainly who he was, a mere expression of opinion as to who he was is not admissible as a dying declaration; but where want of knowledge does not appear either from the statement itself or from other evidence in the case, it must be presumed that the declarant stated a fact within his knowledge. In these circumstances it was a question for the jury whether the declaration represented the primary knowledge of the deceased or merely his opinion. Where the declaration by its terms, taken in connection with the circumstances, merely expresses the declarant's belief as to the identity of the guilty person, it should be excluded. If the declarant sees his assailant or assailants, and from appear-

ances which he may describe he draws a conclusion as to his identity, it is admissible. 30 C. J. 275, § 513. If both the officers were pursuing and shooting at the deceased, and he was hit by a bullet fired by one of them, such shot being fatal, he would know that he was killed by one or the other of his pursuers, but might be unable to say which one fired the fatal shot. Under such circumstances his statement on this subject was not an expression of a mere opinion or a conclusion, but was a statement of a fact. His statement would be admissible to show that he was killed by one or the other of these officers; and the State could by other proof establish the identity of the person firing the fatal shot. So where a deceased stated that he knew the man who inflicted the mortal wound, but could not call his name, it was held that the declaration was not inadmissible because the declarant did not know the person who killed him, when there was other evidence which disclosed the identity of the individual referred to by the declarant. *Odom* v. *State,* 13 *Ga. App.* 687 (79 S. E. 858). So, in this case, the declaration of the deceased that he was shot by one or the other of the officers who sought to arrest him was admissible, when the evidence disclosed the identity of the officer who actually shot and killed him.

■ The dying declaration contained this statement: "I told them my wife and child had nothing for supper, and I would like for the warrant to wait until Monday. The officers said, 'No,' and talked to me pretty rough." The defendant objected to the admission of this part of the declaration, upon the grounds (a) that the statement had no place in the dying declaration, (b) that it is a conclusion, (c) that it does not illustrate the issue on trial, and (d) that it was introduced for the purpose of prejudicing the defendant and his rights. The court overruled the objection, and the defendant excepted. On a trial for murder, dying declarations are admissible to prove any relevant fact embraced in the res gestæ of the killing. *Wilkerson* v. *State,* 91 *Ga.* 729 (3) (17 S. E. 990, 44 Am. St. R. 63). Conversations and conduct which are part of the res gestæ may be admitted as part of a dying declaration. *Bush* v. *State,* 109 *Ga.* 120 (3) (34 S. E. 298); *Harris* v. *State,* 142 *Ga.* 627, 629 (83 S. E. 514). So we are of the opinion that the court did not err in admitting this part of the dying declaration for any of the reasons assigned.

■ The court charged the jury as follows: "Dying declarations, when the jury are satisfied they are such, are founded upon the necessity of the case, and the reason [is] that, being made in view of impending death and judgment, when the hope of life is extinct and the retributions of eternity are at hand, [they] stand upon the same plane of solemnity as statements under oath." The defendant assigns error on this charge, for the reasons that (a) such declarations are not entitled to the same credit and force before the jury as if they had been regularly sworn to before the jury and an opportunity had been given to cross-examine the witness; (b) this instruction had the effect of emphasizing the importance of such declarations and creating in the minds of the jury that they were of superior value to the testimony delivered on the witness-stand by a party under oath, where opportunity is given to cross-examine the witness; (c) this charge is not a correct instruction relative to dying declarations; and (d) said instruction was an invasion of the province of the jury, who should have been left to give such dying declaration such weight and credit as they thought it entitled to have. The above instruction gives the rule or reason why dying declarations are admissible, and does not undertake to state the weight to be given to them by the jury. The court did not instruct the jury that they should have the same credit and force as if they had been sworn to by a witness. This instruction did not have the effect of creating in the minds of the jury an impression that the declarations were of superior value to testimony delivered on the stand by a witness under oath, and did not invade the province of the jury to give to such declarations such weight and credit as they thought they were entitled to. *McArthur* v. *State,* 120 *Ga.* 195 (47 S. E. 553). The instruction contains the correct rule or reason for the admission of dying declarations. *Mitchell* v. *State,* 71 *Ga.* 128 (2). The court in effect told the jury that if they found that dying declarations were in fact made by the deceased, then they stood upon the same plane of solemnity as statements under oath, and were testimony to be considered by the jury. *Findley* v. *State,* 125 *Ga.* 579, 583 (54 S. E. 106). Instructing the jury that dying declarations, when properly proved, stand upon the same plane of solemnity as statements under oath, does not amount to telling the jury that they must have the same force and effect as sworn testimony, or that they are of superior

value to testimony delivered on the stand by a witness under oath. We do not think that this instruction is erroneous for any of the reasons assigned.

■ The deceased made a dying declaration which was reduced to writing and signed by him. On the trial this writing was introduced in evidence. After the court had charged the jury, and they were about to retire to consider their verdict, counsel for the defendant objected to said written statement being allowed to go to the jury, to be considered by them in their deliberations in the case. Counsel for the State agreed that said written statement should be withheld, and not allowed to go to the jury. The jury then retired, and the writing containing the dying declaration was not allowed to go to them. After the court had taken a recess at noon, and while the jury were out considering the case, they requested the judge, through the bailiff who had them in charge, to send the dying declaration of the deceased to them in the jury-room, to be used in their deliberations. This request was made known to counsel for the defendant, who objected to said writing being sent out to the jury, upon the ground that it would magnify the importance of the declaration of the deceased by allowing it to go to the jury-room for their consideration, while the jury would have to depend on their memories for the oral testimony introduced in behalf of the defendant, and that permitting said declaration to go to the jury would be equivalent to admitting a witness to the jury-room during their deliberations. The court overruled said objection, and the written statement containing the dying declaration was permitted to go to the jury for their consideration. To this ruling the defendant excepted.

In *Andrews* v. *Tinsley,* 19 *Ga.* 303, this court held that it was not a good ground for a new trial that interrogatories, which were read to the jury on the trial of the case, were carried to the jury, after they had retired to their room, at their own request, without the fraud or agency of the party in whose favor the verdict was found, merely to refresh their memory in regard to a matter concerning which there was no controversy between the parties. In *Falvey* v. *Richmond,* 87 *Ga.* 99 (13 S. E. 261), it was held that where the plaintiff's counsel inadvertently handed to the jury interrogatories which had been sued out by the plaintiff, but which had not been read or examined by any of the jury, such inadvertence was not a ground for a new trial.

In *Shedden* v. *Stiles,* 121 *Ga.* 637 (49 S. E. 719), this court held that "Interrogatories, though read in evidence, should not be delivered to the jury. Where the court, over the objection of the party against whom the verdict was rendered, sent to the jury, after they had retired to deliberate as to their verdict, interrogatories which had been read in evidence, and which were calculated to influence the jury in favor of the prevailing party, a new trial should have been granted." The court further held that "The reason given for not allowing them to be delivered to the jury is, that the testimony which they contain, if read and reread by the jury, would have an unfair advantage over oral testimony of the other side, by speaking to the jury more than once."

Many decisions hold that depositions read in evidence should not go to the jury. Rawson *v.* Curtis, 19 Ill. 456; U. S. *v.* Clarke, 2 Cranch (C. C.), 152 (Fed. Cas. 14810); Fein *v.* Covenant Mut. Ben. Asso., 60 Ill. App. 274; Pittsburg, &c. R. Co. *v.* Dahlin, 67 Ill. App. 99; Jerry *v.* Townsend, 9 Md. 145; Alexander *v.* Jameson, 5 Binn. (Pa.) 238; Chamberlain *v.* Pybas, 81 Tex. 511 (17 S. W. 50); State *v.* Cain, 20 W. Va. 679 (14), 707; Welch *v.* Ins. Co., 23 W. Va. 288 (3); State *v.* Lowry, 42 W. Va. 205 (4) (24 S. E. 561). The reason for this rule is that the party whose case is sustained by depositions would have an improper advantage over the party whose proofs were oral only. 17 Am. & Eng. Enc. Law (2d ed.), 1241; 38 Cyc. 1833 (II). The principle announced by this Court in *Shedden* v. *Stiles,* supra, is equally applicable to depositions; and we reach the conclusion that under that decision it is improper to permit depositions to go to the jury, for the reason that they, as well as interrogatories, may unduly influence the jury in favor of the party introducing such evidence against the party whose testimony is entirely oral. Does the written statement of a dying declaration, signed by the deceased, fall within this rule? It has been held that such a statement is in effect a deposition, because the solemnity of the circumstances in which the dying declaration is made and the writing containing the declaration is signed by the deceased is equivalent to the oath of a party to a deposition. State *v.* Moody, 18 Wash. 176 (51 Pac. 359); Dunn *v.* People, 172 Ill. 582 (50 N. E. 137); People *v.* Spranger, 314 Ill. 602 (145 N. E. 706); Territory *v.* Eagle, 15 N. M. 609 (110 Pac. 862, 30 L. R. A. (N. S.) 391).

Being in effect a deposition, such statement when introduced by the State should not be permitted to go to the jury after they have retired to consider their verdict, over the objection of the defendant. For this reason we feel constrained to grant a new trial.

■ Lee Land was sworn and examined as a witness for the defendant. On his examination in chief, counsel for the defendant asked him if he knew anything about the defendant being able to run. The witness answered that he never saw him run any, that he had been out on raids with the defendant, and never saw him run after anybody; that the defendant always drove the car and would go with him. On his cross-examination counsel for the State propounded to him this question: "He usually shoots them down instead of running them down?" Thereupon counsel for the defendant moved for a mistrial, because the question propounded by counsel for the State in the presence of the jury was improper, was prejudicial to the rights of the defendant, and made only for the purpose of prejudicing the minds of the jury against him. The court then said: "Gentlemen of the jury, you need not consider that question at all; and Mr. Land, you need not answer the question. The motion is overruled." To this ruling the defendant excepts upon the grounds that the court did not rebuke counsel for the State for propounding the above question, did not instruct the jury that it was improper, and did not in the charge or otherwise make any reference to the incident, other than as above quoted. Counsel for the defendant insists that the propounding of this question by counsel for the State was peculiarly harmful, as counsel is a man of high character and standing in the community and at the bar, and it was asked before a jury with whom he was well acquainted and whose confidence and respect he enjoyed. We think this question was improper. It was pregnant with a statement that was inadmissible, and had a tendency to prejudice the case of the defendant in the eyes of the jury. The trial judge should have rebuked counsel for propounding it; and should have gone further and instructed the jury that it was improper and that they should not consider the implication contained in the question propounded. The instruction that the jury need not consider the question at all was too mild. They should have been expressly told that they should not consider the implication embraced in the question propounded.

*Judgment reversed. All the Justices concur.*